CARL FREDERICK OTTO GRAEF, JR. *v.* STATE
OF MARYLAND

[No. 28, Initial Term, 1967.]

162

164

*Decided April 14, 1967.*

The cause was argued before ANDERSON, MORTON, ORTH, and THOMPSON, JJ., and DYER, J., Associate Judge of the Third Judicial Circuit, specially assigned.

*Leonard J. Kerpelman* for appellant.

*Alfred J. O'Ferrall, Special Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Julius A. Romano, former Assistant Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Allen Lipson, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ANDERSON, J., delivered the opinion of the Court.

Appellant, Carl Frederick Otto Graef, Jr., was found guilty of murder in the second degree by a jury in the Criminal Court

of Baltimore. From his judgment and sentence of ten years confinement, he has appealed.

He contends that the trial court erred: (1) in denying his motions for judgments of acquittal of second degree murder and manslaughter; (2) in allowing the voir dire question on conscientious scruples against capital punishment; (3) in refusing to sequester the jury; (4) in the light of *Escobedo* and *Miranda,* to have admitted a photograph taken of the defendant after his attorney had instructed the police in writing to "conduct no further interviews with the defendant"; (5) in its instructions to the jury.

Since the amendment to Article 15, Section 5 of the Constitution was adopted in 1950 (See also Code (1966 Supp.) Article 27, Section 593 and Maryland Rule 755), it has been the duty of the Court of Appeals, and now this Court, when the question is properly reserved, to review the sufficiency of the evidence to sustain a conviction in a criminal case. In performing this duty, we do not inquire into and measure the weight of the evidence to ascertain whether the State has proved its case beyond a reasonable doubt, but determine if there be any relevant evidence adduced at the trial which would properly sustain a conviction. *Clarke v. State,* 238 Md. 11, 207 A. 2d 456 (1965); *Briley v. State,* 212 Md. 445, and cases therein cited.

I

Applying the above test to the evidence produced below, we have reached the conclusion that it was sufficient to sustain the conviction, even though in substantial part it was circumstantial in nature rather than direct save for the appellant's statement as to how the shooting occurred. It would serve no useful purpose to set out in minute detail the rather voluminous testimony. A summary thereof follows:

On May 16, 1965, Police Officer Earl E. Williams of the Southern District, at about 11:30 p.m., observed the defendant in a phone booth and overheard him talking loudly into the telephone summoning an ambulance to 1308 Light Street because a man had been shot. The officer asked the defendant what the trouble was and was told, "I am trying to get an ambulance. I need it at 1308 Light Street. A man has been shot in my

apartment. He may be dying." The officer and the defendant went to the apartment and the victim of the shooting was found with his feet partially in the doorway and a wound in his back. The officer asked the defendant who did this, and was told, "I did it, but it was an accident." The shotgun used in the shooting was found on the living room floor and the defendant was placed under arrest.

There were no eye-witnesses to the shooting and the defendant elected not to testify at the trial. His version of what happened was related to Sergeant John J. McGee of the Southern District who arrived at the apartment sometime shortly after 11:30 p.m. The defendant told Sergeant McGee in substance that after drinking about six bottles of beer, he left his apartment sometime after 5:00 p.m. and went to the vicinity of City Hall Plaza looking for a homosexual contact. He met one, the deceased, who struck up a conversation with him and a proposition was made—asking the defendant if he wanted to make nine dollars. He said yes. He then accompanied the deceased to a hotel on Baltimore Street where they went to the deceased's hotel room. They drank a half pint of Vodka between them, looked at some pornographic pictures belonging to the deceased, engaged in some minor homosexual play and then went to the defendant's apartment on Light Street for the purpose of looking at some pornographic pictures which belonged to the defendant. On the way to the apartment the deceased stopped and bought six cans of beer.

The accused and the deceased arrived at the defendant's apartment, the defendant got the pictures, a radio and some fried chicken from the refrigerator and they sat down at the kitchen table. Defendant then went into the bedroom and got a record player and some records and started hooking it up in the kitchen. The deceased then got up and walked into the bathroom. While the deceased was in the bathroom the defendant picked up a shotgun which he claimed he had been working on previously and which was lying on an unused gas stove, ostensibly to take it to the bedroom. As he did so the deceased came out of the bathroom where he had been for a short time, ran by him and through the living room to the

front door leading into the hall. As he reached the doorway and was "fidgeting" with the doorknob, the defendant stepped into the living room, the gun went off and the full charge struck the deceased in the back. The deceased fell against the door and then backwards over the sofa. Defendant then opened the door and deceased fell and didn't stir, so the defendant ran outside and went to the outdoor phone booth and called for an ambulance where he was found there by Officer Williams.

On June 18, 1965, defendant appeared with his counsel at the State's Attorney's Office for Baltimore City and with police officers present was interrogated by the Assistant State's Attorney and his own counsel about the shooting. The transcription of this questioning was admitted at the trial without objection and was read to the jury. While it went into what had taken place on the evening in question in greater detail, it was substantially the same story that he had told Sergeant McGee at the time of the shooting.

The gun which was found lying on the living room floor of the defendant's apartment was a shotgun in very poor mechanical condition, in that the trigger and trigger guard and shell extractor were missing; the butt plate was missing; some screws were missing; and the shotgun was sloppy in its fit. Sergeant Charles B. Knight of the Crime Laboratory of the Baltimore City Police Department, who qualified as a gun expert, testified that 6½ to 7 pounds of pull was necessary to retract the hammer off the firing pin. It was his opinion that the gun could only be discharged in one of two ways, either the hammer was pulled back and let go or the hammer was struck from the back with a malletlike object. In order to fire, the hammer must be pulled back to a three-quarter position or full cock or it would not fire. This was proved by his experiments. There was testimony that the gun could be fired by dragging the hammer against one's clothing but even this required that the hammer be pulled back to three-quarter cock. There was no evidence that the gun was dropped before it had been fired. There can be no question but that the gun was a very dangerous weapon and in addition it was fully loaded.

At the end of the entire case the trial judge granted the defendant's motion for judgment of acquittal as to murder in the first degree and denied the defendant's motion for judgment of acquittal as to murder in the second degree and manslaughter on the ground that there was enough evidence to permit the case to go to the jury as to second degree or manslaughter.

The trial court in its instructions explained to the jury that the essential distinction between murder and manslaughter was the presence or absence of malice and that malice was an essential element of second degree murder. The trial court then defined malice in this connection as the intentional doing of a wrongful act to another without legal excuse or justification. It includes any wrongful act done wilfully or purposely. In this regard the court further instructed the jury as follows:

> "If the jury should find that the defendant did shoot the deceased, and did so with intent to inflict serious bodily harm upon him, and did so without any just cause or excuse for doing so or without any circumstances of mitigation, then and in that event, if you so find, the defendant would be deemed to have shot the deceased with malice aforethought. And if the jury further find that death ensued as a result of such shooting, then the defendant would be guilty of murder in the second degree."

The evidence shows that the defendant was armed with a shotgun from the time shortly after the victim went into the bathroom and that he shot the deceased in the back from a distance of about eleven feet as he was fidgeting with the doorknob in an attempt to open the door leading into the hallway. At the time he was shot he was fleeing from the defendant, having run from the bathroom through the living room to the door. The defendant had no explanation of how or why the shotgun went off. He said merely that it went off when he stepped into the living room. The shotgun would not fire except by pulling the hammer back and letting it go or by being struck from the back with an object. The gun would not fire unless the hammer was pulled back at least three-quarter cock and it took 6½ to 7 pounds of pull to retract the hammer.

The defendant never did say in his oral statement to the police on the evening of the shooting or in the State's Attorney's Office that the gun went off by brushing against his clothing as was demonstrated by his counsel before the jury. Even when scraped against the clothing it was necessary to pull the hammer back three-quarter cock and a fair amount of pressure would have to be applied against the body or by turning sharply. Although the defendant was looking to run into a homosexual contact to make some money, he never did get any money from the deceased.

The evidence as outlined above, together with the reasonable and permissible inferences to be drawn therefrom, was sufficient to permit a finding by the jury of all the essential elements of second degree murder; hence the case was properly submitted to the jury.

This ruling renders it unnecessary to discuss denial of appellant's motion for a judgment of acquittal of manslaughter.

## II

We find that the trial court did not err in allowing the voir dire question on conscientious scruples against capital punishment.

In *Corens v. State,* 185 Md. 561, 564, 45 A. 2d 340 (1946), it was settled that a person who has conscientious scruples against capital punishment cannot properly examine the evidence in a prosecution for a crime for which capital punishment may be imposed because he does not stand impartial between the defendant and the State. When it is shown on the voir dire examination of a prospective juror that he has such conscientious scruples, the State may challenge for cause.

The defendant argues that the State knew at the time of trial that the evidence was not sufficient to support a first degree murder verdict and, as a result of the question being asked, the defendant was deprived of "nine sensitive and humane veniremen who were thus disqualified."

In the instant case the defendant was charged in an indictment with first degree murder and the question was within the discretion of the trial court who felt it to be a proper question under the indictment.

## III

The defendant next contends that there was error on the part of the trial court in refusing to sequester the jury after he made such a request.

Under Article 51, Section 29 of the Code, the trial court in its discretion may permit the jurors before the submission of the case to the jury to separate or to be kept in charge of proper officers. See also Maryland Rule 543 a (8). In *Midgett v. State*, 223 Md. 282, 164 A. 2d 526 (1960), the Court of Appeals held that the separation of the jury is permissible in the discretion of the trial court prior to submission of the case to the jury and prejudice is not to be presumed from such separation simply because of the possibility of influence or contamination through outside contact. There the Court noted that the statute makes no distinction between different types of criminal cases and that the rule is the same for capital cases, for non-capital cases and for misdemeanors. Here the record clearly shows that the court issued proper admonitions to the jury when recesses occurred.

The deceased was a priest and while that fact was not revealed to the jury, one juror, at the end of the first day, reported to the court that he was aware of this and thought he may have previously met him. On questioning by the court and defense counsel he stated this would have no effect upon his verdict. After a discussion with the defendant, his counsel stated he was fully satisfied and refused to ask for a mistrial, and although the court offered to replace this juror with the alternate (13th) juror, both defendant and counsel refused. Although defendant's counsel offered a newspaper clipping in evidence which discussed the trial and again moved to sequester the jury on the ground of prejudice from newspaper publicity he failed to show that the article was prejudicial, that any juror had read the newspaper article, and that any juror's decision was influenced by any newspaper publicity. The trial court was very careful in her admonitions to the jury and there is nothing to show they were not heeded. *Presley v. State*, 224 Md. 550, 555, 168 A. 2d 510 (1960). We find no abuse of the court's discretion in refusing to sequester the jury.

## IV

The defendant further contends that the court erred in admitting a photograph of the defendant in evidence after his attorney had instructed the police in writing to "conduct no further interviews with the defendant." In this connection he cites the recent Supreme Court cases of *Escobedo* and *Miranda*. However, the constitutional principles enunciated in these cases apply to custodial interrogation of criminal suspects. Neither *Escobedo* or *Miranda* prohibit a reasonable search. Fingerprinting and photographing are not proscribed. In *Schmerber v. California*, 384 U. S. 757, 16 L. Ed. 2d 908 (decided June 20, 1966), the United States Supreme Court held that a compulsory blood test, despite the accused's refusal to submit on advice of counsel, and admitted in evidence over his objection, did not violate his 4th, 5th and 6th Amendment rights and the due process clause of the 14th Amendment as afforded by *Escobedo v. Illinois*, 378 U. S. 478, 12 L. Ed. 977 (1964) ; *Miranda v. Arizona*, 384 U. S. 436, 16 L. Ed. 694 (1960) ; and *Mapp v. Ohio*, 367 U. S. 643, 16 L. Ed. 719 (1961). The Court held that the blood sample did not violate the 4th Amendment prohibiting unlawful search and seizure because the arrest was lawful and there was no invasion of privacy. The Court stated further that the suspect's privilege against self-incrimination was not violated because the taking of the blood sample was not a testimonial or communicative act. Finally, it was stated that the 6th Amendment right to counsel was not violated when the blood sample was taken for the reason that, despite counsel's advice, there was no legal right to object to the blood test. Here, the photograph was taken to show the type of trousers the defendant was wearing at the time of his arrest. This type of trousers required no belt and it had been so testified by one of the State's witnesses, Detective Fishback. We find no error in its admission in evidence.

## V

Lastly, appellant contends that the court erred in its instructions to the jury. In presenting this argument counsel has taken certain portions of the court's instructions out of context. When the court's instructions are read in the entirety

it will be seen that they fairly and accurately state the law as applied to the facts in this case. After explaining the difference between murder and manslaughter the court instructed the jury that if they "should find from the evidence that the shooting of the deceased was done by the defendant but that such shooting was accidental, unintentional, without any fault on his part, or was not due to the wanton and reckless disregard of human life, then and in any of these events, your verdict should be not guilty." The court then went on to explain the burden of proof upon the State, and proof beyond a reasonable doubt. Maryland Rule 756 b provides that "the court need not grant any requested instructions if the matter is fairly covered by the instructions actually given." We find no error in the court's instructions which fully and adequately cover the law applicable to this case.

For the above reasons the judgment must be affirmed.

*Judgment affirmed.*