## WILLIAM ELMER JOHNSON, LANCELOT WARD AND JAMES ARTHUR GARRETT *v.* STATE OF MARYLAND

[No. 68, September Term, 1970.]

*Decided January 7, 1971.*

654

The cause was argued before MURPHY, C.J., and MOR-TON and MOYLAN, JJ.

*Steny H. Hoyer,* with whom were *Robert J. Woods, Andrew E. Greenwald, Karl G. Feissner, William L. Kaplan, Thomas P. Smith,* and *Fred R. Joseph* on the brief, for appellants.

*T. Joseph Touhey, Assistant Attorney General,* with

whom were *Francis B. Burch, Attorney General,* and *Thomas A. Rymer, State's Attorney for Calvert County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellants, James Arthur Garrett, William Elmer Johnson and Lancelot Ward, were all convicted in the Circuit Court for Calvert County by Judge Perry G. Bowen, Jr., sitting without a jury, of (1) conspiracy to break into a dwelling house with intent to steal property of the value of less than $100; (2) conspiracy to steal goods of the value of less than $100; and (3) roguery and vagabondage.

Johnson and Ward have joined together in one joint appeal. Garrett has filed a separate appeal. Between the two appeals a number of issues have been raised:

(1) Whether the trial judge abused his discretion in denying Garrett a Motion for Continuance.

(2) Whether the charge of "conspiracy to break and enter the dwelling house of another with the intent to steal property of the value of less than $100" invalidly charges a conspiracy to commit a nonexistent crime.

(3) Whether the search of the trunk of the automobile in which all three appellants were arrested was unconstitutional under the Fourth and Fourteenth Amendments to the United States Constitution.

The remaining issues, though somewhat distinct, all relate generally to the sufficiency of the evidence.

### Denial of the Motion for a Continuance

The appellant Garrett was indicted, along with his co-defendants, on July 2, 1969. On July 14, 1969, Xavier Aragona filed his appearance for Garrett, Ward and Johnson. On that same day, Garrett was released on bail. On the morning of trial, October 14, Mr. Aragona requested a continuance for Garrett on two grounds:

(1) That he himself had had difficulty in locating the appellants and had therefore not had an adequate opportunity to prepare the case, and

(2) That a co-counsel for all three appellants, Robert J. Woods, had only entered his appearance that morning.

The State's Attorney for Calvert County pointed out to the Court that after several earlier attempts to arrange a trial date with defense counsel, the October 14th date had been agreed upon. He indicated to the Court that the October date had been set for "well over a month". In denying the Motion for a Continuance, the trial judge pointed out that defense counsel had had adequate time and notice to prepare the case and that the appellants had "had the advice and counsel of an able and competent member of the Bar practicing in this Court for a substantial period of time". He pointed out that the State and the public have a right to the speedy and prompt disposition of criminal charges, just as does a criminal defendant. He pointed out that it is the established practice in the courts of his (the Seventh) Circuit to try criminal cases within a ninety-day period of arrest, wherever possible. ·

As this Court pointed out in *Clark and Richardson v. State*, 6 Md. App. 91, 100-101:

> "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process; the answer must be found in the circumstances present in a given case."

We find no arbitrary abuse of discretion in this case.

### Adequacy of the Conspiracy Charge

The contention of all three appellants as to the adequacy of the conspiracy charge under the fourth count is disingenuous. That count charged that they:

> "unlawfully did conspire together to break into the dwelling house of Joseph William Tony Horsmon, there situate, with intent feloniously to steal, take and carry away certain goods, chattels, monies and properties of the said Joseph William Tony Horsmon, of the value of less than One Hundred Dollars ($100.00) . . ."

The appellants' claim is that the stated object of the conspiracy is not an indictable crime. Such is not the case. There can be no doubt that the appellants clearly knew that they were charged with a conspiracy, the predicate of which was the commission of daytime housebreaking in contravention of Art. 27, Sec. 30(b), 1957 Code (1967 Repl. Vol.).

The words "the dwelling house of Joseph William Tony Horsmon" make patent that the contemplated crime was a housebreaking under Art. 27, Sec. 30(b), rather than a storehouse breaking under either Sec. 32 or Sec. 342. The absence of any allegation as to the nighttime or as to an entering makes it clear that it was housebreaking that was charged and not common law burglary or statutory burglary.

The language ". . . of the value of One Hundred Dollars ($100.00) and upwards" under the second count, as to which the motion was granted, and ". . . of the value of less than One Hundred Dollars ($100.00)" under the fourth count, upon which the conviction was had, is, to be sure, language reminiscent of Secs. 32 and 342. As to the housebreaking charge before us, under which the intent to steal goods of any value will suffice, the distinction made between the second and fourth counts was a completely superfluous one. But under either of the counts, although the language was inartful and laborious, the necessary larcenous intent was clearly set forth. "Of the value of $100.00 and upwards" is by definition "of some value." "Of the value of less than $100.00" is equally as clearly "of some value." Of the charge in question, no more was required. If anything, the count before us said more than it had to, not less. See *Putnam v. State,* 234 Md. 537; *Hickman v. Brady,* 188 Md. 103; and *Reagan v. State,* 4 Md. App. 590.

The formal requirements of draftsmanship, to be sure, have a salutary purpose in informing a defendant of the precise accusation he is called upon to answer. They may not be conceived of, however, as an invitation to a linguistic chess game in which a party may poise himself

ready to pounce the moment an unwary opponent leaves his King unguarded. The search for truth is too fundamental to be so hypertechnically side-tracked. For honest confusion, adequate remedies are readily available.

Both *Putnam, supra,* and *Reagan, supra,* point out that the appellants, had they suffered real doubts, could have 1) challenged the sufficiency of the indictment under Maryland Rule 725b, 2) demanded a bill of particulars under Maryland Rule 715a and/or 3) moved for discovery and inspection under Maryland Rule 728. They did none of these, and obviously had no need to.

There is an additional thrust to the appellants' argument. It is not simply that the fourth count did not say enough to put them on the right track but that it affirmatively misdirected them onto a wrong track. Their thesis is that since the language "of the value of $100 or upwards" and "of the value of less than $100" appears nowhere in Sec. 30(b) but does appear in Secs. 32 and 342, the storehouse breaking offenses, the use of such language can have no conceivable explanation except in contemplation of charging an offense under Secs. 32 or 342. That thesis is guilty of a non-reading of history.

Daytime housebreaking (Sec. 30(b)) has led a statutory life of its own only since 1965. (Chap. 345, Acts of 1965). Before that date, daytime housebreaking and storehouse breaking with intent jointly occupied Sec. 32. The two offenses had a common origin in a series of English statutes enacted throughout the Sixteenth and Seventeenth Centuries. The two offenses appeared together in Maryland at least as early as 1793. (Chap. 57, Acts of 1793) They were codified together in 1809. (Chap. 138, Acts of 1809) The same intent provision served both classes of buildings from the common birth until as late as 1943. (Chap. 229, Acts of 1943) The present Sec. 342 shared this common destiny since it is an offshoot of the greater storehouse breaking with intent offense, branching off from it only in 1933. (Chap. 78, Acts of 1933 (Spec. Sess.)).

Unquestionably, from the centuries of sharing a com-

mon statutory provision, the habit arose of charging the offenses with a common indictment form, using only a blank space or two to make the limited distinctions that were required. In view of a cohabitation so venerable and an estrangement so recent, the fact that each of the now distinct offenses has taken on a certain coloration and certain habitual language tracing from the long association between them is not remarkable.

### The Search of the Automobile

The appellant Garrett complains of the search of the trunk of the automobile which was conducted at the scene of the arrest but after the arrestees had been handcuffed and removed to the police station. Items were recovered from the trunk which bore directly on the rogue and vagabond charge, particularly that part of it which proscribes "the possession of tools or implements from which a felonious intent could be inferred," *Crossland v. State,* 252 Md. 70, 72, and which bore indirectly on the general charge of conspiracy to commit daytime housebreaking. The facts will be more fully alluded to in discussing the sufficiency of the evidence, *infra,* but it is clear that the police had "probable cause in the constitutional sense to believe that the vehicle contain[ed] that which is subject to seizure, whether it be contraband . . . or the fruits or instrumentalities of a crime." *Cornish and Gilman v. State,* 6 Md. App. 167, 175. See also *Johnson v. State,* 8 Md. App. 28, 32-33.

The thrust of Garrett's argument is that the search was not incidental to the arrest and therefore in contravention of *Preston v. United States,* 376 U. S. 364, and *Agnello v. United States,* 269 U. S. 20. Garrett's reliance on *Preston* and *Agnello* is misplaced. *Chambers v. Maroney,* 399 U. S. 42, made it clear that although some searches of automobiles may in special circumstances be based upon the doctrine of a search incidental to a lawful arrest, the dominant rationale for the warrantless search of an automobile is bottomed upon a completely independent doctrine, to which all considerations of the

arrest and the arrestee are largely irrelevant. That doctrine was first announced in *Carroll v. United States*, 267 U. S. 132 (1925), and has been reaffirmed, interpreted and expanded by the Supreme Court in *Husty v. United States*, 282 U. S. 694 (1931); *Scher v. United States*, 305 U. S. 251 (1938); *Brinegar v. United States*, 338 U. S. 160 (1949); *Dyke v. Taylor Implement Mfg. Co.*, 391 U. S. 216 (1968) and *Chambers v. Maroney, supra,* (1970).

*Carroll* distinguished the home from the automobile and recognized that automobiles and other conveyances might be searched under circumstances which would not justify the search without a warrant of a house or an office. It held that the police may conduct a warrantless search of an automobile where they have probable cause to believe that the automobile contains contraband or the fruits, instrumentalities or evidence of crime.

*Chambers* finally put to rest the notion that the police may be required to "seize" and thereby immobilize an automobile while they then proceed to try to obtain a warrant for the follow-up "search" of the automobile. The Court said:

> "For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." 399 U. S. at 52.

See also *Middleton v. State*, 10 Md. App. 18, and cases cited therein applying *Carroll* to Maryland. Under the *Carroll* doctrine, the search of the trunk of the automobile in the case before us was clearly not unconstitutional.

### Lack of Owner's Consent

The contention, made by Garrett alone, that the State failed to prove that he (Garrett) did not have the own-

er's consent to go upon the Horsmon property is not well taken. The evidence revealed that 1) the police received information that Mr. Horsmon's home would be burglarized and, with Mr. Horsmon's cooperation, staked themselves out in his home on three successive Sunday mornings, 2) Garrett on the second Sunday morning, along with his confederates, "cased" the premises a) by car, b) on foot and c) by telephone and then quickly departed the scene when a dentist-neighbor observed him and 3) Garrett repeated the "casing" of the premises on the third Sunday morning, again a) by car, b) on foot and c) by telephone, approached the rear of the property, opened the back door without ringing or knocking and then, upon hearing a shot when the gun belonging to one of the policemen accidentally discharged, fled not only the immediate scene but the general area. The factfinder could reasonably infer that Garrett did not have Mr. Horsmon's consent to be on the property.

### Rational Inference of "Some Value"

The appellants Johnson and Ward contend that the trial judge committed reversible error in "taking judicial notice" of the fact that some items in the Horsmon home had "some value". The point has no substance since only the intent at the time of the breaking would be relevant, not what was ultimately taken nor even whether there was anything at all in the building to be taken.

In *Ridley v. State*, 228 Md. 281, there was no testimony as to the value of the contents of the building, as in the instant case, but the Court of Appeals upheld the conviction for storehouse breaking with intent, saying:

> "The actual intention at the time of the breaking is controlling, not whether any goods of value were found and stolen, and the intention may be inferred from the circumstances." P. 282.

See also *Johnson v. State*, 5 Md. App. 540, 545-546.

### Legal Sufficiency of Conspiracy Evidence

It is difficult to follow the logic of the contention made by appellants Johnson and Ward that the conspiracy charge must fail "where this is no evidence to show: a) that there was an agreement specifically to break into a house, b) that the property was a dwelling house, c) that the goods had any value, d) the ownership of the goods, e) a breaking." The gravamen of conspiracy is the meeting of the minds, the unlawful combination and agreement. *Piracci v. State,* 207 Md. 499; *Garland v. State,* 112 Md. 83; *Lanasa v. State,* 109 Md. 602; *Price v. State,* 4 Md. App. 701. The crime is complete the moment the unlawful agreement is made and there is no necessity to show any steps taken in execution of the unlawful design let alone to show a full consummation of the crime agreed upon. Johnson and Ward's subcontentions "b", "c", "d", and "e" all go to matters which are completely beyond and external to the mere unlawful agreement. It is to restate the self-evident to say that there need be no proof of a breaking in order to establish a mere conspiracy to break. Subcontention "a" merges into the general contention made by all three appellants that there was legally insufficient evidence to show a conspiracy to commit housebreaking and larceny.

It is fundamental that a conspiracy may be shown by circumstantial evidence permitting the inference of a common design. It is not necessary to demonstrate that the conspirators met and agreed in terms to a design and to the pursuit of that design by common means. The concurrence of action is sufficient to enable the factfinder to presume a concurrence of sentiment, and from this the actual fact of conspiracy may be inferred. *Piracci v. State, supra; Foster v. State,* 230 Md. 256; *Hill v. State,* 231 Md. 458; *Price v. State, supra.*

The evidence showed that the police had unverified information from an unnamed source that a housebreaking would be perpetrated upon the home of Mr. Horsmon and that it would be perpetrated on a Sunday. Mr. Horsmon

was a businessman and the owner of a company in Prince Frederick, Maryland. His home was on the outskirts of Prince Frederick and it contained, among other things, a safe. On three successive Sundays, May 25, June 1 and June 8, 1969, the police stationed themselves inside the Horsmon home awaiting the possible arrival of the expected thieves. May 25 was uneventful.

On June 1 the 1967 Buick Electra, aqua or dark green in color with a black convertible top, and bearing District of Columbia license tags, the same automobile in which all three appellants and a fourth codefendant were arrested a week later, drove past the house at 8:20 a.m. The vehicle was occupied by several Negro males, the exact number not being determined. The appellant Ward was identified as the front-seat passenger. The car passed the house at a slow rate of speed. Ten minutes later the telephone rang twelve times. It was not answered. A short time later the same vehicle returned from the opposite direction, occupied only by its driver. Several minutes after the second cruising by of the vehicle, the appellant Ward walked past the house northbound carrying a stick in his hand. He walked past the house to a driveway at the boundary of the property, turned around and walked south again out of sight. A few minutes later Ward approached the Horsmon residence again with the appellant Garrett. Ward pointed the stick which he was carrying down the driveway and then engaged in conversation with Garrett. Both Ward and Garrett then continued walking north past the immediately adjacent house of a neighboring dentist and then past the next house beyond that. Two or three minutes later Ward returned in the company of an unidentified Negro male and stopped at the driveway of the Horsmon residence. The man accompanying Ward started to walk onto the lawn of the Horsmon property but immediately turned around and walked out of the yard with Ward when the neighboring dentist appeared on his porch next door. Ward and the unidentified male walked south past the property where they were joined by another Negro male who was carry-

ing a bag over his shoulder, estimated to be approximately thirty-six inches in length. They all walked out of sight. A few minutes later the same Buick automobile passed in front of the residence again, with its occupants closely observing the residence. Nothing else occurred on that day.

On June 8 the same *modus operandi* was followed to a fault. At approximately 8:20 a.m. the same Buick passed in front of the Horsmon residence at a low rate of speed, Ward again occupying the right front seat. Shortly afterward the phone rang again, approximately twelve times. Again it was not answered. Several minutes later the Buick was again observed, this time travelling in the opposite direction past the Horsmon residence. Approximately two minutes later the appellant Garrett walked south in front of the Horsmon property. At that time he suddenly trotted across the lawn in front of the residence and down the driveway to a screen porch behind the house. The screen door was heard to open. At that moment a .12 gauge shotgun being held by one of the officers inside the house accidentally discharged. Garrett disappeared.

The radio alert went out, and at 9 a.m. other officers observed and halted the Buick automobile, which was then occupied by all three appellants as well as by the codefendant Ellis Watson. All four occupants were taken into custody.

A search of the trunk of the automobile turned up a P-38 Luger pistol with a live round of ammunition in the chamber and five others in the clip. Also found were a pair of soft brown cotton gloves which would have, among many legitimate functions, the possible utility of preventing the user from leaving fingerprints. Also turned up was a hammer of the type customarily used in body and fender work but which the trial judge described as "also capable of breaking small hasps on locks or applying force to the ends of pries or crowbars useful in breaking other people's enclosures or safety receptacles". Also recovered were a pair of bolt cutters which the trial

judge described as follows: "They were a pair of bolt cutters of substantial size and the capacity. Now the bolt cutters can cut many things besides bolts. They will cut many things besides bolts; they will cut the hasp of locks; they will cut small screening up to substantial wire, window screen, and as a matter of fact, they will cut almost any small, not specifically case hardened, piece of metal."

From all of the evidence, the inference that all three appellants were acting pursuant to a pre-arranged design to break the house of Mr. Horsmon and to steal therefrom was not unreasonable.

### Legal Sufficiency of Rogue and Vagabond Evidence

Art. 27, Sec. 490 embraces, *inter alia,* a situation wherein "The accused at the time of apprehension possessed tools or implements from which a felonious intent could be inferred." *Crossland v. State,* 252 Md. 70, 72-73.

The appellants Johnson and Ward wish to disassociate their possession of the burglar tools in the trunk of the automobile from the presence of the appellant Garrett on the Horsmon property. Garrett, conversely, wishes to disassociate his presence on the property from the possession by Johnson and Ward of the implements in the trunk of the automobile. Unfortunately for the appellants, they cannot fragment their guilt as easily as they can fragment their separate roles in the execution of the common crime. By the basic doctrine of imputability, each is responsible for the actions of the others either as 1) literal co-conspirators, or 2) mere non-conspiratorial accomplices. To establish the proper interpretive context, the collective actions of the entire "gang" must be viewed. That the second wave of reinforcements with the heavy ordnance was still "lying conveniently off-shore" while the assault wave went in to make the initial breach, does not relieve either wave from sharing in the responsibility for the conduct of the other.

From looking at the collective actions of all three appellants as a group, it is clear that all three were in possession of burglar tools and implements from which a

felonious intent could be inferred. See *McCray v. State,* 236 Md. 9, 14-15, where bolt cutters and a monkey-wrench were held to be among "the other implements" contemplated by the Statute, and *Martin v. State,* 203 Md. 66, 74-75, wherein three screwdrivers and a pair of pliers were held to be within the contemplation of the Statute. See also *Wright v. State,* 222 Md. 242, 247, and *Bevans v. State,* 180 Md. 443, for situations wherein the finding of the burglarious instruments in the trunk of an automobile was held to be possession by the defendants within the meaning of this Statute. *Goldstein v. State,* 179 Md. 697, fully reported 22 A. 2d 471, deals with a situation where possession of the burglarious implements by one codefendant served to implicate the others.

The trial judge found that the appellants were rogues and vagabonds. We cannot say that he was clearly wrong.

*Judgments affirmed.*