JAMES LEE STANLEY ENGLAND AND THOMAS EDWARDS *v.* STATE OF MARYLAND

[No. 787, September Term, 1973.]

*Decided May 28, 1974.*

The cause was argued before GILBERT, MENCHINE and MOORE, JJ.

*Gerald A. Kroop,* with whom was *Jacob D. Hornstein* on the brief, for appellants.

*Gary Melick, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Mary Ann Willen, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

GILBERT, J., delivered the opinion of the Court.

A jury, presided over by Judge J. William Hinkel, in the Criminal Court of Baltimore, convicted James Lee Stanley England (England) and Thomas Edwards (Edwards), appellants, of rape, perverted practices and assault. Judge Hinkel sentenced both appellants to imprisonment for the balance of their natural lives for the commission of the rape and suspended the imposition of sentences on all remaining counts.

Appellants, in this Court, assert three reasons why the judgments should be reversed, *scilicet:*

(1) The trial judge erred in failing to suppress evidence obtained as the result of an illegal search and seizure.

(2) Error was committed when the trial judge

sustained an objection to a question designed to show that the prosecutrix was the mother of an illegitimate child.

(3) The life sentence was improper in that it exceeded the statutory authority.

Edwards, individually, raises two additional contentions, namely:

(4) The in-court identification of him by the prosecutrix was tainted by an impermissibly suggestive photographic identification.

(5) The trial court erred in not granting a requested jury instruction.

On the night of December 8, 1972 the prosecutrix, a thirty-four year old married woman, was abducted from the street near her home by two men. She was forced at knife point into an automobile and thence driven to Druid Hill Park. The prosecutrix's skirt and pantyhose were removed, and she was repeatedly ravished by her abductors. In addition, she was compelled to submit to perverted sexual acts. During the ordeal suffered by the prosecutrix she discovered that one of her attackers had a massive keloid scar on his back. Both the rapists had removed all of their clothing and the prosecutrix felt the scar during the commission of the rape. The prosecutrix also learned that one of her attackers was named "Lee".

The victim managed to throw herself from the automobile and sought help from two men who were standing nearby. The two men, however, ignored the prosecutrix's lamentations, but the prosecutrix was allowed into a motor vehicle containing an unidentified man and woman, which was stopped nearby. That car then drove from the scene. The two rapists followed for a short time, and the prosecutrix was able to obtain the license number of their motor vehicle. The "Good Samaritans" took the prosecutrix to her home from which she telephoned the police. The victim was able to furnish a detailed description of her abductors-rapists and, in addition to the license number, a description of the motor vehicle. The car itself was quite

unique in that it was a yellow Dodge Dart that was partially covered with psychedelic flowers. The victim also told the police that during the time that she was compelled to spend with the rapists a tape recording was continuously playing, "The Coldest Day of My Life". The prosecutrix, on December 9, 1972, picked England's photograph from a group of eight pictures that were shown to her. Investigation revealed that the motor vehicle bearing license tag number LE 6380, the number given to the police by the prosecutrix, was a 1967 yellow Dodge Dart registered to England.

Officer William Harris, acting upon the information learned from the prosecutrix and the State Motor Vehicle Administration, went to the residence of the appellant, England, at 1620 East 32nd Street. England was not at home. Officer Harris did not return to England's residence until the 12th day of December, 1972, the day after England had surrendered himself to the police. When England was interrogated he told the police that he knew nothing about the rape, and said that at the time it was supposed to have occurred he was elsewhere in company with his girlfriend and Edwards. As a result of that information the police again visited the prosecutrix and exhibited to her five other photographs. She picked from those photographs a picture of Edwards whom she said was the other rapist. Edwards was arrested on December 15, 1972.

In the meantime on December 12, 1972, as we have previously noted, Officer Harris, accompanied by members of the police crime laboratory team, went to the residence of England and conducted a warrantless search of England's vehicle. From the car the police took a towel that was the same color as one described by the victim as having been used by her attackers to wipe themselves. Glasses, which closely matched a description furnished by the victim of those worn by England, were found in the glove compartment. In addition, Officer Harris recovered from England's brother a tape of "The Coldest Day of My Life". Examination of the towel by a forensic chemist showed the presence of sperm thereon.

The prosecutrix made a positive in-court identification of

England and Edwards as her assailants, and stated that there was no doubt in her mind as to the identification of the two appellants. Edwards denied any knowledge of the offense and said that he was with England and Cheryl Lucas at the time that the rape was supposed to have occurred. Cheryl Lucas verified Edwards's testimony. England elected not to testify.

## I.

England strenuously argues that the warrantless search of his automobile was violative of his constitutional rights. This Court, in a number of recent cases, has considered warrantless searches of automobiles. In each we have grounded our approval of police action upon the exigent circumstances existent at the time of the search. *See Robinson v. State,* 18 Md. App. 678, 308 A. 2d 734 (1973); *Soles v. State,* 16 Md. App. 656, 299 A. 2d 502 (1973); *Skinner v. State,* 16 Md. App. 116, 293 A. 2d 828 (1972); *Bailey v. State,* 16 Md. App. 83, 294 A. 2d 123 (1972); *Peterson v. State,* 15 Md. App. 478, 292 A. 2d 714 (1972); *Scales v. State,* 13 Md. App. 474, 284 A. 2d 45 (1971); *Johnson v. State,* 10 Md. App. 652, 272 A. 2d 422 (1971); *Middleton v. State,* 10 Md. App. 18, 267 A. 2d 759 (1970); *Johnson v. State,* 9 Md. App. 166, 263 A. 2d 232 (1970); *Sutton v. State,* 8 Md. App. 285, 259 A. 2d 561 (1969); *Cook v. State,* 8 Md. App. 243, 259 A. 2d 326 (1969); *Johnson v. State,* 8 Md. App. 28, 257 A. 2d 756 (1969); *Cornish v. State,* 6 Md. App. 167, 251 A. 2d 23 (1969).

In the instant case, however, there were simply no exigent circumstances which prevented the police from obtaining a search and seizure warrant for the automobile of England. The police were in possession of detailed information concerning the identity of the appellants, a description of the automobile including the license number, and the address of the owner of the vehicle. The information was known to the officers some time on December 9, 1972, three days before the search, and thus the police had ample time to obtain a search warrant had they so desired.

The Fourth Amendment to the Constitution of the United States provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

*See also* Constitution of Maryland, Declaration of Rights, Art. 26, which has been held to be *in pari materia* with the Fourth Amendment. *Givner v. State,* 210 Md. 484, 124 A. 2d 764 (1956); *Johnson v. State,* 193 Md. 136, 66 A. 2d 504 (1949); *Bass v. State,* 182 Md. 496, 35 A. 2d 155 (1943); *Blum v. State,* 94 Md. 375, 51 A. 26 (1902).

Mr. Justice Jackson, writing for the Court, in *Johnson v. United States,* 333 U. S. 10, 68 S. Ct. 367, 92 L. Ed. 436 (1948), said at 13-14:

" The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. . . . When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." (Footnotes omitted).

The Supreme Court stated, in *Boyd v. United States,* 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746 (1886), at 635:

". . . It may be that it is the obnoxious thing in

its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be *obsta principiis*."

In *Coolidge v. New Hampshire*, 403 U. S. 443, 91 S. Ct. 2022, 29 L.Ed.2d 564 (1971), *rehearing denied*, 404 U. S. 874, 92 S. Ct. 26, 30 L.Ed.2d 120 (1971), after quoting from *Boyd, supra*, the Court held at 454-55:

"Thus the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.' [*Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)]. The exceptions are 'jealously and carefully drawn,' [*Jones v. United States*, 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958)] and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.' [*McDonald v. United States*, 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948)]. '[T]he burden is on those seeking the exemption to show the need for it.' [*United States v. Jeffers*, 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951)]. In times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and the values that it represents may appear unrealistic or

'extravagant' to some. But the values were those of the authors or our fundamental constitutional concepts. In times not altogether unlike our own they won — by legal and constitutional means in England, [see Entick v. Carrington, 19 How.St.Tr. 1029, 95 Eng. Rep. 807 (1765), and Wilkes v. Wood, 19 How.St.Tr. 1153, 98 Eng. Rep. 489 (1763)] and by revolution on this continent — a right of personal security against arbitrary intrusions by official power. If times have changed, reducing everyman's scope to do as he pleases in an urban and industrial world, the changes have made the values served by the Fourth Amendment more, not less, important. [See Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960)]."

Although the State cites *Chambers v. Maroney,* 399 U. S. 42, 90 S. Ct. 1975, 26 L.Ed.2d 419 (1970), *rehearing denied,* 400 U. S. 856, 91 S. Ct. 23, 27 L.Ed.2d 94 (1970) to support its contention that the warrantless search was valid, we find it inapposite. In *Chambers,* the Supreme Court announced that "exigent circumstances" justified a warrantless search, where probable cause existed, of an automobile that was "stopped on the highway." The reason for such a holding is that the automobile is "movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained." The Court pointed out that, "the opportunity to search is fleeting. . . ." The key words to *Chambers* are "exigent circumstances", but the exigency is conspicuous by its absence in the instant case. *Chambers* does not stand for the principle that the police, given probable cause, may search any automobile under any circumstances. Nor do the recent cases of *United States v. Robinson,* 414 U. S. 218, 94 S. Ct. 467, 38 L.Ed.2d 427 (1973) and *Gustafson v. Florida,* 414 U. S. 260, 94 S. Ct. 488, 38 L.Ed.2d 456 (1973) extend warrantless searches of automobiles to the extent reached in the case before us. Both *Robinson* and *Gustafson* are concerned with searches made incident to an arrest.

*Coolidge v. New Hampshire, supra,* while not "on all

fours" with the instant case, is strikingly similar. There, as here, the police had knowledge for some time of the role of the automobile in the crime; there, as here, ample time existed for the procurement by the police of a search and seizure warrant; there, as here, there was probable cause, but no exigent circumstances justified the warrantless proceeding by the police. The search and seizure of the automobile of England was unlawful, and the evidence obtained as a result of that search should have been suppressed.

If the Fourth Amendment to the Constitution of the United States and the Maryland Declaration of Rights, Art. 26, are to have meaning, they may not be eroded by over-zealous police officers who, under the guise of exigency, utilize expediency to conduct warrantless searches of automobiles when, in fact, no exigency exists. The consent of England to search his vehicle, given by him on December 13, 1972, the day after the search was actually conducted, does not, in our view, under the circumstances of this case, operate as a *nunc pro tunc* waiver of England's Fourth Amendment rights. Nor is our view altered by the testimony of the police that before they obtained England's consent to search they informed him that the search of the entire vehicle, except the trunk, had already been completed. Because it is patent from the record that the consent given by England was to search the trunk, we cannot read into that consent a sanctioning of the previous unlawful search.

In this case, however, the victim's detailed testimony concerning the rape, her positive identification of the assailants, her description of England, the furnishing, by her, to the police of the name "Lee", the license tag number, the description of the "light" colored car and the keloid scar on Edwards's back, propels us to the inescapable conclusion that the admission of the proscribed evidence was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U. S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967).

In view of our holding herein, it is unnecessary for us to decide whether Edwards had the right to challenge the admission of the evidence that was seized from England's

car. *See,* however, in regard to standing to object to the admission of seized items: *Shope v. State,* 18 Md. App. 472, 307 A. 2d 730 (1973); *Palmer v. State,* 14 Md. App. 159, 286 A. 2d 572 (1972); *Brooks v. State,* 13 Md. App. 151, 282 A. 2d 516 (1971); *Mills v. State,* 12 Md. App. 449, 279 A. 2d 473 (1971); *Walters v. State,* 8 Md. App. 583, 261 A. 2d 189 (1970); *Kleinbart v. State,* 2 Md. App. 183, 234 A. 2d 288 (1967).

## II.

Appellants next argue that Judge Hinkel should have allowed them to inquire of the prosecutrix as to whether she had, prior to the instant case, given birth to an illegitimate child. We think the judge's refusal to allow the question to be correct.

In *Humphreys v. State,* 227 Md. 115, 175 A. 2d 777 (1961), the Court of Appeals, speaking through Judge Sybert, said, at 121-22:

> "It is well established that there is no requirement that the victim of the crime of rape be chaste, as far as the common law is concerned. 'But the law of England . . . holds it to be felony to force even a concubine or harlot.' 4 *Blackstone, Commentaries* 213. See also . . . *State v. Beltz,* 279 N.W. 386 (Iowa 1938); *Perkins, Criminal Law,* Chap. 2, p. 116. However, *the general character of the prosecutrix as to chastity or unchastity is admissible in the majority of common law jurisdictions, including Maryland, because of its probative value in determining whether the act was committed with or without her consent, a necessary element in the common law crime of rape. Shartzer v. State,* 63 Md. 149 (1885); *Brown v. State,* 72 Md. 468, 20 Atl. 186 (1890). See also 140 A.L.R. 380 and 1 *Wigmore, Evidence* (3rd ed) § 62." (Emphasis supplied).

To the same effect *see Giles v. State,* 229 Md. 370, 183 A. 2d 359 (1962), *appeal dismissed,* 372 U. S. 767, 83 S. Ct. 1102, 10 L.Ed.2d 137 (1963); *Alexander v. State,* 4 Md. App. 214, 242 A. 2d 180 (1968).

It is unmistakable from the record in this case that there was no allegation by the appellants that the prosecutrix had consented to their having sexual relations with her. Indeed, the defense was not consent, but alibi. In short, the appellants sought to show that they were elsewhere at the time of the commission of the crime. Whatever the victim's reputation for chastity, it was not an issue, and the question posed to her was properly disallowed.

### III.

Appellants next contend that the sentence imposed upon them exceeded the statutory authority. The judge instructed the jury:

"You may return in that count [rape], the verdict of not guilty, guilty, or guilty without capital punishment. If your verdict is guilty, then under the present statute, [under] the law of Maryland, this Court is without the power to impose the penalty of death, but may sentence the defendant to confinement for life; [1] confinement for not more than twenty years,[2] if your verdict is guilty without capital punishment, then the maximum sentence that I may impose may be confinement for not more than twenty years."

The essence of the appellants' argument is that following the abolition of capital punishment, *Furman v. Georgia*, 408 U. S. 238, 92 S. Ct. 2726, 33 L.Ed.2d 346 (1972), *rehearing denied*, 409 U. S. 902, 93 S. Ct. 89, 34 L.Ed.2d 163 (1972); *Bartholomey v. State*, 267 Md. 175, 297 A. 2d 696 (1972);

---

1. Md. Ann. Code Art. 27, § 461 provides in pertinent part:

"Every person convicted of a crime of rape or as being accessory thereto before the fact shall, at the discretion of the court, suffer death, or be sentenced to confinement in the penitentiary for the period of his natural life, or undergo a confinement in the penitentiary for not less than eighteen months nor more than twenty-one years; . . ."

2. Md. Ann. Code Art. 27, § 463 provides that if a jury qualifies its verdict with the words "without capital punishment" the sentence imposed by the court shall not exceed twenty years.

*McLaughlin v. Warden,* 16 Md. App. 451, 298 A. 2d 201 (1973), the maximum penalty that may be imposed for a conviction for rape is twenty years. Such, however, is not the law. We need do no more than refer to *Johnson v. Warden,* 16 Md. App. 227, 295 A. 2d 820 (1972), in which Chief Judge Orth rejected a somewhat similar contention by saying, at 231:

> ". . . Therefore, the permissible punishment under [Md. Ann. Code Art. 27, § 461] on conviction of those crimes is confinement in the penitentiary for life, or for a period of not more than 21 years, at the discretion of the court. We think that *Furman* has no effect on § 463. It is true that the court could not impose the death penalty whether or not the jury added the words 'without capital punishment' to their verdict, but by adding those words the jury limits the maximum punishment which may be imposed to imprisonment for not more than 20 years. This may be explained to the jury. In other words it was the obvious intent of the legislature that by adding the words of limitation to their verdict the jury could preclude the imposition not only of the death penalty but also of life imprisonment. That intent may still be fulfilled. We hold that Code, Art. 27, § 463 is in full force."

We think Judge Hinkel's instructions to the jury were unambiguous, and that the jury fully understood that a verdict of guilty, without qualification, could lead to the imposition of a life sentence, but that if they were to qualify their verdict by appending thereto "without capital punishment", that the trial judge would be limited to the imposition of a sentence of not more than twenty years.

## IV.

Appellant, Edwards, contends that the victim's judicial identification of him was tainted by an impermissibly suggestive pretrial photographic identification. Although Edwards objected at one stage of the testimony to the identification of him by the victim, it is clear that the

objection came too late. Earlier in the trial the victim identified Edwards as one of her assailants. No objection was made thereto. Consequently the issue is not properly before us as it has not been preserved for our review. Md. Rules 522 (d) (2) and 725f. *Townsend v. State*, 11 Md. App. 487, 275 A. 2d 191 (1971); *Jones v. State*, 9 Md. App. 455, 265 A. 2d 271 (1970); *Thompson v. State*, 6 Md. App. 50, 250 A. 2d 304 (1969); *Boswell v. State*, 5 Md. App. 571, 249 A. 2d 490 (1968). If it be of any solace to Edwards, however, we have reviewed the record in the light of the Supreme Court's holding in *Simmons v. United States*, 390 U. S. 377, 88 S. Ct. 967, 19 L.Ed.2d 1247 (1968), and this Court's holdings in *Conway v. State*, 15 Md. App. 198, 289 A. 2d 862 (1972); *Crenshaw v. State*, 13 Md. App. 361, 283 A. 2d 423 (1971); *Smith v. State*, 6 Md. App. 59, 250 A. 2d 285 (1969), and have found nothing in the identification procedure that is suggestive of taint or otherwise violative of Edwards's rights.

## V.

Edwards requested the trial judge to instruct the jury that:

> "The Court instructs the jury that testimony tending to prove identity [is] to be scrutinized with extreme care and that the possibility of human error or mistakes, and probable likeness or similarity of objects and persons are elements that you must act upon in considering testimony as to identity. You must carefully consider these factors in passing upon the credibility that you attach to each of the witnesses' testimony and you must be satisfied beyond a reasonable doubt as to the accuracy of the witnesses (sic) identification of the Defendant."

Judge Hinkel declined to give the quoted instruction, but rather advised the jury in pertinent part:

> "In making or reaching a conclusion as to the credibility of any witness, and in weighing the

testimony of any witness, you may consider any matter that may have a bearing on that subject. If you believe that any witness has wilfully, knowingly, and intelligently testified falsely to any material fact in this case, then you may reject any part or all of the testimony given by such witness. A witness may be impeached by contradictory evidence. That is, if the witness has previously said something, or previously acted in a manner inconsistent with his present testimony. You may consider the demeanor or behavior of the witness on the stand. You may consider whether the witness has any motive for not telling the truth. Whether the witness had full opportunity to observe the matters concerning that which he has testified to; or whether the witness has any interest in the outcome of the case.

\* \* \*

The identification of an accused person by a single eye-witness, if believed, may be sufficient to sustain a conviction. Lack of positiveness in identification of an accused person affects only its weight, and the sufficiency of the identification is for your determination. Corroboration of the said identity, if any you find, may give more weight to the witness' testimony. The identification of an accused person by the victim needs no corroboration."

Edwards relies heavily upon *McKenzie v. United States*, 126 F. 2d 533 (D.C. Cir. 1942) to bolster his argument that the trial judge erred in not granting the requested instruction. In *McKenzie* the Court considered a case wherein a robbery and rape had occurred. The identification of the accused by the victim was very unorthodox. The victim was transported by the police in a vehicle through the sections of Washington D.C. that were inhabited largely by black persons. The purpose of the trip was to enable her to view as many black men as possible. After five or six hours the victim pointed

out McKenzie as the robber-rapist. There was a substantial variance between the description furnished the police immediately following the robbery-rape and that of McKenzie. Furthermore, the trial judge's instructions to the jury were far from clear and utterly failed to advise that "if the evidence failed to measure up to the required standard they should find him *not guilty.*" The appellate court stated:

" Referring to the conditions obtaining at the time of identification, the court said the jury should take into consideration the attitude of the 'parties' on that occasion — what 'parties' the court had in mind is not clear; that they should take into consideration the number of people that had been passed and inspected, the attitude of the [victim] upon coming 'in view of this particular person,' meaning of course, appellant; that they should search their 'reasoning powers as to what motivated the selection of this particular person from among all others.' ' There is,' said the court, 'always an uncertainty in the human element, namely, something produced to him; maybe it was the real identity of the man who ravished her. We can never know just exactly what produced those actions.' Precisely what meaning the jury attributed to this unusual language we cannot be sure. But since the verity of identification was the point on which the case would turn, the quoted words above should undoubtedly have been followed by a caution that if the 'motivation' was not convincing beyond a reasonable doubt, the jury should find the defendant *not guilty.* The possible implication from the words used, that less than positive and unqualified certainty was sufficient, was permission to the jury to guess or speculate. And the failure to say in plain words that if the circumstances of the identification were not convincing, they should acquit, was error."

*McKenzie* is both factually and legally inapposite. In the present case Judge Hinkel instructed the jury as to the

State's burden of proof and as to the rule relative to reasonable doubt. Moreover, he clearly advised the jury that the testimony of the rape victim, standing alone, if believed, is sufficient to sustain the conviction. *Estep v. State,* 14 Md. App. 53, 286 A. 2d 187 (1972); *Crenshaw v. State, supra; Williams v. State,* 11 Md. App. 350, 274 A. 2d 403 (1971); *Lucas v. State,* 2 Md. App. 590, 235 A. 2d 780 (1967). The jury was further informed by Judge Hinkel that in assessing credibility they could consider "any matter that may have a bearing on that subject" including contradictory evidence, demeanor or behavior on the witness stand, motive for not telling the truth and whether the witness "had full opportunity to observe the matters concerning that which he has testified to; or whether the witness [had] any interest in the outcome of the case."

We think that although the requested prayer, above quoted, was not given in its precise form, it was, nevertheless, substantially embraced within the court's instructions. "The court need not grant any requested instruction if the matter is fairly covered by the instructions actually given." Md. Rule 756 b. *Gordon v. State,* 14 Md. App. 245, 286 A. 2d 833 (1972); *Harris v. State,* 11 Md. App. 658, 276 A. 2d 406 (1971); *Nelson v. State,* 5 Md. App. 109, 245 A. 2d 606 (1968); *Graef v. State,* 1 Md. App. 161, 228 A. 2d 480 (1967). If jury instructions when read as a whole, clearly set forth the applicable law, there is no reversible error. *Burko v. State,* 19 Md. App. 645, 313 A. 2d 864 (1974); *Fowler v. State,* 18 Md. App. 37, 305 A. 2d 200 (1973); *Kable v. State,* 17 Md. App. 16, 299 A. 2d 493 (1973); *Young v. State,* 14 Md. App. 538, 288 A. 2d 198 (1972); *Gordon v. State,* 14 Md. App. 245, 286 A. 2d 833 (1972); *Shotkosky v. State,* 8 Md. App. 492, 261 A. 2d 171 (1970). We perceive no error.

*Judgments affirmed.*