ENGLAND AND EDWARDS *v.* STATE OF MARYLAND

[No. 162, September Term, 1974.]

*Decided March 24, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Gerald A. Kroop* and *Jacob D. Hornstein, Assigned Public Defenders*, for appellants.

*Gary Melick, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General*, and *Clarence W. Sharp, Assistant Attorney General*, on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court.

After a jury in the Criminal Court of Baltimore had convicted petitioners, James Lee Stanley England (England) and Thomas Edwards (Edwards), on charges of rape, perverted sexual practices and assault, the trial judge (Hinkel, J.) sentenced them to imprisonment for the balance of their natural lives on the rape convictions, and suspended the imposition of sentence on the remaining offenses. On appeal to the Maryland Court of Special Appeals, the convictions were affirmed in *England and Edwards v. State,*

21 Md. App. 412, 320 A. 2d 66 (1974). We then granted a Writ of Certiorari.

The nature and scope of the questions presented on appeal to this Court obviate the need for a detailed account of the crimes. Suffice it to say that on the evening of December 8, 1972, the prosecutrix was abducted at knifepoint by petitioners while walking near her residence in Baltimore, and was taken by them in England's automobile to Druid Hill Park. There, she was repeatedly raped by the use of violence and threats, and was forced to engage in perverted acts. She finally managed to free herself and was driven to her home by the occupants of another automobile. On reaching the safety of that vehicle, she was able to obtain the license number of the England car.

Immediately upon arriving at her residence, the prosecutrix telephoned the police. Responding to that call, Officer William Harris arrived at 12:15 a.m. on December 9. She not only furnished him the license number, but provided remarkably detailed descriptions of the assailants and the automobile. She also advised the officer that the driver was called "Lee" by his companion, and that the latter had a pronounced keloid scar on his side which the victim had felt while she was being raped by him. She described the automobile as light in color, having a brown decal or contact paper decorating the front fenders.

The prosecutrix was then taken to Central Police Station where, following a medical examination, she readily identified England by selecting his photograph from a group of eight shown to her by Officer Harris. The officer had already learned from the Motor Vehicle Administration that the automobile bearing the tag number furnished by the prosecutrix was owned by England. On that same day — December 9—Officer Harris and his supervisor went to the England address, but were informed by his mother that he was not at home. He subsequently surrendered to the police on December 11.

On December 12, Officer Harris learned from a fellow officer, Detective Giangrasso, that the latter had just

observed the automobile at the England residence. He responded to that location and observed, parked in the street in front of the England residence, a yellow Dodge Dart bearing the license number furnished by the prosecutrix. There was a small patterned or textured design along the fender and the front of the car. Noting that the car was unlocked, Officer Harris then called the police crime laboratory and requested that a technician be dispatched to the scene. Together, they conducted a warrantless search of the automobile.

Among the objects disgorged by that search — and removed by them — was a soiled towel on which seminal fluid and spermatozoa were found by microscopic examination. The prosecutrix had related to Officer Harris that England had "wiped himself" with a towel which he had pulled from beneath the driver's seat. In addition, Officer Harris obtained a tape recording of a song called "The Coldest Day of My Life" from England's brother at the residence. While the attacks were being carried out, the prosecutrix had heard this song being played on a device mounted on the bottom of the dashboard in the automobile. The officers took photographs of the interior of the automobile which were received in evidence. A motion to suppress the evidence seized from the automobile was denied during the trial.

When England was interrogated by Detective Giangrasso at the Baltimore City jail on the 13th, he claimed to have been elsewhere with his girlfriend and one Thomas Edwards while the crimes were being perpetrated. A day or two later, the detective showed five photographs to the victim who readily selected one of petitioner Edwards and positively identified him as the second rapist. At the trial, the prosecutrix, without objection, made positive in-court identifications of both petitioners as her two assailants.

These contentions are presented here:

1. That the trial judge erred in refusing to suppress the evidence seized during the warrantless search of the automobile.

2. That the trial judge erred in refusing to grant one of petitioner Edwards's requested instructions.

3. That the life sentences imposed upon petitioners were invalid because the trial judge did not explicitly instruct the jury that if it qualified a guilty verdict by adding the words "without capital punishment," the maximum punishment which could then be imposed would be a sentence of 20 years. In the alternative, they urge that we strike down the sentences on the rape convictions as being illegal in light of *Furman v. Georgia,* 408 U. S. 238, 92 S. Ct. 2726, 33 L.Ed.2d 346 (1972).

(1)

When the State sought to elicit testimony from Officer Harris regarding the December 12 search conducted by him and the laboratory technician, petitioners moved to suppress any evidence seized from the automobile.[1] The trial judge then excused the jury and heard oral argument from counsel.[2]

At the conclusion of the hearing, the trial court denied the motions and, finding there was probable cause to search the automobile coupled with exigent circumstances, admitted the seized evidence under the so-called "automobile exception" to the Fourth Amendment proscription against warrantless searches and seizures. On appeal to the Court of Special Appeals, that court concluded that the search and seizure were illegal because there were no exigent circumstances preventing the police officer from obtaining a warrant to search the automobile, but held that the error was harmless beyond a reasonable doubt, *England and Edwards v. State, supra,* 21 Md. App. at 416-20. We think that such exigent circumstances were present.

---

1. In addition to seizing the soiled towel and taking the photographs, the police also removed a pair of black-rimmed glasses, a "bath cloth," a napkin and a piece of tissue paper. On appeal, petitioners press their argument only with respect to the towel, the tape player and the tape itself. The tape player, however, was neither seized nor offered as evidence, and the tape was obtained from the England home, not from the automobile.

2. Regrettably, additional testimony, which might have filled some of the gaps we have encountered in this record, was not presented during this hearing.

As we observed in *Mobley and King v. State,* 270 Md. 76, 80, 310 A. 2d 803 (1973), *cert. denied,* 416 U. S. 975 (1974), the "automobile exception" had its genesis in *Carroll v. United States,* 267 U. S. 132, 45 S. Ct. 280, 69 L. Ed. 543, 39 A.L.R. 790 (1925). In *Mobley and King,* Chief Judge Murphy said for the Court:

> ". . . Under [the 'automobile exception'], a motor vehicle, unlike a home, may be searched without a warrant or previous arrest under appropriate circumstances when the officer has probable cause in the constitutional context to believe that the vehicle contains the fruits, instrumentalities, or other evidence of a crime. See, *Dyke v. Taylor Implement Mfg. Co., Inc.,* 391 U. S. 216, 88 S. Ct. 1472, 20 L.Ed.2d 538 (1968); *Brinegar v. United States,* 338 U. S. 160, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949); *Scher v. United States,* 305 U. S. 251, 59 S. Ct. 174, 83 L. Ed. 151 (1938); *Husty v. United States,* 282 U. S. 694, 51 S. Ct. 240, 75 L. Ed. 629 (1931); *United States v. Lee,* 274 U. S. 559, 47 S. Ct. 746, 71 L. Ed. 1202 (1927). Since the rule is justified on the basis that an automobile is so readily movable as to make impracticable the obtaining of a search warrant, the existence of exigent circumstances must be shown in addition to probable cause to validate the warrantless search. . . ." 270 Md. at 80-81.

At the outset, petitioners readily concede that the police, at the time of the search here, had probable cause to believe that the automobile contained the "fruits, instrumentalities or other evidence of a crime." They argue forcefully, however, that there were no exigent circumstances.

The cardinal principle upon which petitioners bottom their attack is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U. S.

347, 357, 88 S. Ct. 507, 19 L.Ed.2d 576 (1967). The "automobile exception" — the only one capable of justifying the search here — is not applicable, they say, because the element of unforeseeability, so essential to its application, is lacking. They rest this contention on *Coolidge v. New Hampshire,* 403 U. S. 443, 91 S. Ct. 2022, 29 L.Ed.2d 564 (1971). In agreeing with this argument, the Court of Special Appeals also drew heavily upon *Coolidge* for support.

The state counters this argument with the contention that *Coolidge,* said to be the only "automobile exception" case in which the Supreme Court has found a lack of exigent circumstances, arose out of a unique factual situation and is virtually *sui generis.* Moreover, it is contended, the element of unforeseeability was present here, since the police had been unable to locate the automobile until just prior to the search on December 12. In short, the state maintains that there were exigent circumstances because the automobile could be quickly moved out of the "locality or jurisdiction"; hence, it was not practicable to obtain a search warrant.

Unquestionably, the holding in *Coolidge* is severely circumscribed by its unusual facts. For example, a search and seizure warrant was actually obtained there, albeit one which was defective because it was issued by the Attorney General of the state acting as a justice of the peace, rather than by "a neutral and detached magistrate." The police had known the identity of the automobile and its owner, and had possessed probable cause to search the vehicle, for several weeks before they actually attempted to do so. These facts alone overwhelmingly established the practicability of obtaining a valid search warrant. The Coolidge automobile was immobilized upon a private driveway, where it had been parked regularly. Not only had he been arrested, but his wife had been placed in what amounted to protective custody in another town before the search was initiated. The Coolidge premises, although totally unoccupied, were nevertheless guarded throughout the night by two policemen. There were no "confederates" who might have moved or destroyed the evidence.

In rejecting application of the *Carroll* doctrine, the

*Coolidge* Court, quoting in part from *Chambers v. Maroney,* 399 U. S. 42, 51, 90 S. Ct. 1975, 26 L.Ed.2d 419 (1970), emphasized that exigent circumstances arise when the car is " 'movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained.' '[T]he opportunity to search is fleeting . . . .' " 403 U. S. at 460. Thus, the Court said, "by no possible stretch of the legal imagination can this be made into a case where 'it is not practicable to secure a warrant,' . . . and the 'automobile exception,' despite its label, is simply irrelevant." 403 U. S. at 462.

The facts here, indeed, stand in marked contrast to those in *Coolidge.* Although the police had known the identity of the vehicle and its owner for three days, it is apparent that they were unable to locate the car until just before they searched it on the 12th. Only one inference can be drawn from the evidence — that they had been looking for it at the England residence during that entire period. After three days of failure, and with England already in custody and unavailable to drive it, the surprise appearance of the automobile on the street in front of his residence was as much a fortuity as might have been its discovery by the police while parked at some other location, or while it was actually being driven in that neighborhood.

Furthermore, the absence of the owner from the car while it was being approached did not necessarily eliminate the mobility factor. Here there was ample opportunity for England's "confederate," who was still at large, to remove the car or its contents just as quickly as it had appeared. One can readily understand why the police officer did not pause to obtain a warrant under those circumstances. The automobile was not only accessible to Edwards and members of England's family, who had a set of keys in their home, but in its unlocked condition, it was fair game for any vandal who, noting the absence of its owner, might have wished to open the unlocked door. Unlike the Coolidge automobile, which was secured in a private driveway, the vehicle here was parked and, for all the police knew, completely unattended on a public street.

In *Chambers v. Maroney, supra,* the Court said:

> ". . . *Carroll, supra,* holds a search warrant unnecessary where there is probable cause to search an automobile stopped on the highway; the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained. Hence an immediate search is constitutionally permissible." 399 U. S. at 51.

From what we have said, it is evident that the car here was also movable, that one of its two occupants was alerted, and that the car's contents might never have been found had the police officer interrupted his trip to obtain a search warrant. In short, the criteria postulated by *Carroll* for establishing exigent circumstances — still recognized by the Supreme Court today — are present in this case.

That the car searched here, like its counterpart in *Coolidge,* was not stopped while being driven on the "open highway," as was the case in *Carroll, Brinegar* and *Chambers,* does not defeat the claim of exigent circumstances. Concededly, it is quite likely that in most cases where the claim is advanced, the automobile will be in actual operation. Nevertheless, there is no absolute requirement that an occupied car be stopped on the "open highway" to invoke the "automobile exception." *See, e.g., Scales v. State,* 13 Md. App. 474, 481-82, 284 A. 2d 45 (1971) (search of an unoccupied automobile on apartment house parking lot); *United States v. Church,* 490 F. 2d 353, 354-55 (9th Cir. 1973), *cert. denied,* 42 U.S.L.W. 3631 (U. S. May 13, 1974) (search of an unoccupied automobile parked on public street); *United States v. Cohn,* 472 F. 2d 290, 292 (9th Cir. 1973) (unoccupied automobile parked on public street); *United States v. Castaldi,* 453 F. 2d 506, 510 (7th Cir. 1971), *cert. denied,* 405 U. S. 992 (1972) (unoccupied vehicle parked on public street seized after operator in custody); *People v. Dumas,* 9 Cal. 3d 871, 109 Cal. Rptr. 304, 313, 512 P. 2d 1208 (1973) (search of unoccupied automobile parked on public street 100 feet from owner's residence); *People v. Elaman,* 51

Mich. App. 55, 214 N.W.2d 557, 559-60 (1974) (unattended car on parking lot); *cf. People v. Brandys*, 15 Ill. App. 3d 379, 304 N.E.2d 471 (1973), *cert. denied*, 43 U.S.L.W. 3209 (U. S. Oct. 15, 1974).

Nor is the claim of exigent circumstances lost by the action of the police officer in searching the automobile immediately instead of delaying the search until he removed the car to the police station and obtained a warrant. What the Court said in *Chambers* is apposite:

> "Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the 'lesser' intrusion is permissible until the magistrate authorizes the 'greater.' But which is the 'greater' and which the 'lesser' intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." 399 U. S. at 51-52.

In the final analysis, we are confronted here with a situation in which the police officer had as much reason to be concerned with a sudden disappearance of the automobile as he might have had while observing it in movement on the "open highway." Under the particular circumstances which then obtained, it was not unreasonable for him to believe that the opportunity to search was "fleeting." It is *unreasonable* searches and seizures, of course, that the Fourth Amendment forbids. We are not, in any event, prepared to fault his judgment in determining that it was "not practicable to secure a warrant," since we think he had ample reason to fear that the car might "be quickly moved out of the locality or jurisdiction." We therefore hold there

were exigent circumstances present when the search and seizure were made. Hence, the objection to the seized evidence was properly overruled.

A caveat is in order. We do not mean to be understood as declaring "open season" on every unattended automobile which the police have probable cause to believe contains the "fruits, instrumentalities or other evidence of a crime." The elements of the exigent circumstances requirement — so necessary to the application of the "automobile exception" — remain. Only when it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought, that is, only when it can be said that the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained, are there exigent circumstances. In short, the opportunity to search must be fleeting.

(2)

At the conclusion of the evidence, petitioner Edwards submitted the following instruction:

> "The Court instructs the jury that testimony tending to prove identity be scrutinized with extreme care and that the possibility of human error or mistakes, and the probable likeness or similarity of objects and persons are elements that you must act upon in considering testimony as to identity. You must carefully consider these factors in passing upon the credibility that you attach to each of the witnesses' testimony and you must be satisfied beyond a reasonable doubt as to the accuracy of the witnesses' identification of the Defendant."

Although refusing to grant the specific instruction, the court charged the jury meticulously and completely. In addition to carefully explaining the presumption of innocence and the burden of proof, the court included the following:

> ". . . The defendant is entitled to every inference in

his favor which can be reasonably drawn from the evidence. Where two inferences may be drawn from the same set of facts, one consistent with guilt and one consistent with innocence, the defendant is entitled to the inference which is consistent with innocence.

"In making or reaching a conclusion as to the credibility of any witness, and in weighing the testimony of any witness, you may consider any matter that may have a bearing on that subject. . . . A witness may be impeached by contradictory evidence. That is, if the witness has previously said something, or previously acted in a manner inconsistent with his present testimony. You may consider the demeanor or behavior of the witness on the stand. You may consider whether the witness has any motive for not telling the truth. Whether the witness had full opportunity to observe the matters concerning that which he has testified to; or whether the witness has any interest in the outcome of the case.

\* \* \*

"The identification of an accused person by a single eyewitness, if believed, may be sufficient to sustain a conviction. Lack of positiveness in identification of an accused person affects only its weight, and the sufficiency of the identification is for your determination. Corroboration of the said identity, if any you find, may give more weight to the witness' testimony. The identification of an accused person by the victim needs no corroboration."

Although, when requested to do so, it is incumbent upon the trial judge in a criminal case to give an advisory instruction on every point of law essential to the crime charged if supported by evidence, *Hardison v. State*, 226 Md. 53, 172 A. 2d 407 (1961); *Mumford v. State*, 19 Md. App. 640,

313 A. 2d 563 (1974); *Carter v. State,* 15 Md. App. 242, 289 A. 2d 837 (1972), where the point of law embodied in the requested instruction is fairly covered in the instructions actually given, no error is committed by the refusal to grant the requested instruction, *Bartholomey v. State,* 260 Md. 504, 273 A. 2d 164 (1971), *modified,* 408 U. S. 938 (1972); *Cropper v. State,* 233 Md. 384, 197 A. 2d 112, 16 A.L.R.3d 1069 (1964); *Brown v. State,* 222 Md. 290, 159 A. 2d 844 (1960); *Harris v. State,* 11 Md. App. 658, 276 A. 2d 406 (1971).

This principle is dispositive of petitioners' contention. We think that the point sought to be made by the proffered instruction was fairly covered by the thorough instructions given on the burden of proof and the weighing of evidence. *McKenzie v. United States,* 126 F. 2d 533 (D.C. Cir. 1942), heavily relied upon by petitioners, as Judge Gilbert said for the Court of Special Appeals, "is both factually and legally inapposite." *England and Edwards v. State, supra,* 21 Md. App. at 426. We have noted, of course, that only petitioner Edwards submitted the instruction and excepted to its denial. As to England, therefore, this issue is not, in any event, properly preserved for appellate review. Maryland Rule 885.[3]

### (3)

In charging the jury, the court stated:

"There are a number of possible verdicts that you may render in these cases. . . .

"Under count one . . ., Mr. England is charged with rape. You may return in that count, the verdict of not guilty, guilty, or guilty without capital punishment. If your verdict is guilty, then under the present statute, the law of Maryland, this Court is without the power to impose the penalty of death, but may sentence the defendant to confinement for life; confinement for not more than twenty years, if your verdict is guilty without capital punishment, then the maximum sentence

---

3. Counsel on appeal did not represent petitioners in the trial of this case.

that I may impose may be confinement for not more than twenty years.

\* \* \*

"Now, as to Mr. Edwards, . . . count one again charges that defendant with rape. And you may return the same type verdicts; that is not guilty, guilty, guilty without capital punishment, and the same explanation applies to that count in that indictment. . . ."

Later, the court indicated that the possible verdicts would be furnished the jurors in writing while they deliberated.

In this Court, petitioners mount a two-pronged attack on those instructions. First, they contend that the court failed to advise the jury with sufficient clarity that it could limit the sentence of the court to 20 years on the rape charges by adding the words "without capital punishment" to its verdict of guilty. Secondly, they argue that the effect of the Supreme Court holding in *Furman v. Georgia, supra,* is to limit the punishment which can be imposed in the event of a rape conviction to a maximum of 20 years. We find no merit in either contention.

What more the court might have said to the members of the jury to advise them of the possible verdicts in this case eludes us. In any event, as we said in the face of an identical contention in *Domneys v. Warden,* 232 Md. 659, 661, 194 A. 2d 443 (1963), *cert. denied,* 377 U. S. 949 (1964), on facts virtually indistinguishable from those here, "We think there can be no real doubt that the jury was made fully aware that, if it deemed it proper, it could prevent the death penalty (life imprisonment) by qualifying its verdict of guilty by the phrase 'without capital punishment.' "

The other facet to petitioners' attack on their life sentences arises from what they contend is the effect of *Furman* on Maryland Code (1957, 1971 Repl. Vol.) Art. 27, § 461, which prescribes the possible punishments for the crime of rape.[4] In essence, they argue that the excision of the death

---

4. Section 461 provides in relevant part:

"Every person convicted of a crime of rape or as being acces-

penalty provision from § 461 had a modifying effect on § 463, so as to limit the maximum punishment for this crime to a sentence of 20 years.[5] This result is compelled, they say, because these two sections of the Code are "inseparably intertwined." We think the answer to this contention, as did the Court of Special Appeals, is found in the reasoning of the court in *Johnson v. Warden*, 16 Md. App. 227, 295 A. 2d 820 (1972), where Judge Orth said for the court:

> ". . . We think that *Furman* has no effect on § 463. It is true that the court could not impose the death penalty whether or not the jury added the words 'without capital punishment' to their verdict, but by adding those words the jury limits the maximum punishment which may be imposed to imprisonment for not more than 20 years. This may be explained to the jury. In other words it was the obvious intent of the legislature that by adding the words of limitation to their verdict the jury could preclude the imposition not only of the death penalty but also of life imprisonment. That intent may still be fulfilled. We hold that Code, Art. 27, § 463 is in full force." 16 Md. App. at 231.

In sum, although the language of § 463 would appear somewhat anomalous at a time when there is no death penalty, that section of the Code nevertheless remains intact. When read together with § 461, it reveals a legislative intent that the words "without capital punishment" are to

---

sory thereto before the fact shall, at the discretion of the court, suffer death, or be sentenced to confinement in the penitentiary for the period of his natural life, or undergo a confinement in the penitentiary for not less than eighteen months nor more than twenty-one years; . . ."

5. Section 463 provides in relevant part:
"The jury which finds any person guilty of rape under § 461 of this subtitle, . . . may add to their verdict the words 'without capital punishment,' in which event the sentence of the court shall not exceed twenty years in the penitentiary; and in no such case in which the jury has returned a verdict including the words 'without capital punishment' shall the court in imposing sentence, sentence the convicted person to pay the death penalty or to be confined in the penitentiary for more than twenty years."

prevent not only the death penalty, but also life imprisonment. Whenever a jury qualifies its verdict by adding those words, the punishment is not to exceed 20 years' imprisonment.

We think the jury was properly instructed with respect to the possible verdicts which it might render, and that the court was free to impose a life sentence in the absence of a verdict qualified with the words "without capital punishment."

*Judgment affirmed.*