STATE OF CONNECTICUT *v.* WILLIE WILLIAMS

HOUSE, C. J., LOISELLE, BOGDANSKI, BARBER and SIDOR, Js.

Argued January 7—decision released April 20, 1976

*Ronald E. Cassidento,* for the appellant (defendant).

*Richard A. Schatz,* assistant state's attorney, with whom, on the brief, was *George D. Stoughton,* state's attorney, for the appellee (state).

House, C. J. Following an indictment by a grand jury, the defendant was tried by a three-judge court on a charge of murder in the first degree and found guilty as charged. From that judgment the defendant has taken this appeal. Although one of his assignments of error was that the court erred in concluding that upon all the evidence he was beyond a reasonable doubt guilty as charged, that assignment of error has not been briefed and is considered abandoned. *State* v. *Beauton,* 170 Conn. 234, 236–37, 365 A.2d 1105; *State* v. *Brown,* 163 Conn. 52, 55, 301 A.2d 547. Another assignment of error—

that the court erred in denying a motion to suppress statements made by the defendant to the police—is not considered not only for the same reasons but because it was expressly abandoned during argument on the appeal. We consider, then, the three assignments of error pressed on the appeal—that the trial court erred in denying three separate motions to suppress items of evidence. As to each of these motions, the three-judge court which tried the case made the decisions which are claimed as error and as to each motion made a separate finding. We will consider each ruling separately, but to place them in context we first, very briefly, summarize the court's lengthy general finding of fact on the merits of the case.

About 4:15 p.m., on July 4, 1971, the body of John Wilson was found in a remote area of Windsor. He had been shot six times and his rear and side trouser pockets were torn and pulled out. He had been dead between eighteen and thirty hours. Bullets were removed from his body, shells and a brown paper bag were found in the area near the body, and a plaster of paris cast was made of a tire track found adjacent to the body. The police investigation led to the defendant as a suspect in the slaying. They obtained a search warrant pursuant to which they searched his apartment where they seized a specific type of ammunition listed in the search warrant as well as two shotguns which investigation disclosed had been stolen from the home of Manning W. Heard. On July 9, the defendant was arrested for unrelated offenses. After being advised of his constitutional rights, he made certain oral statements to the police and on July 12, after again being informed of his rights, he gave the police a written statement. On July 13, the police found the defend-

ant's car. They took custody of the car and made a visual comparison between the left front tire of the automobile and a photograph of the tire track which had been found beside Wilson's body. The car was then towed to the Windsor police department where, after a search warrant had been obtained, it was searched on July 14. The police found two witnesses who disclosed that on July 3 the defendant was at a gasoline station near where the body was found and who observed the presence of blood on the shirt of the defendant. Each of them, separately, identified the defendant from groupings of photographs. The police investigation also disclosed that a handgun and a rifle which had been used in the shooting of Wilson had been hidden in the basement of the home of a relative of the defendant at 57 Westland Street and that the defendant's brother-in-law had removed the guns after he had talked to the defendant while he was in jail. Further investigation disclosed that the plaster of paris cast of the tire found beside Wilson's body matched the tread on the front left tire of the defendant's automobile, that there were stains of Wilson's type blood on the interior of the car, and that on the morning of July 3 the defendant had been at 57 Westland Street (the home from the basement of which the weapons used in the slaying were later removed by the defendant's relative) and had washed his automobile there. Two witnesses testified that the defendant drove his car to pick up Wilson on the morning of July 3 and a third witness observed Wilson get into the defendant's car which the defendant was driving. Although the defendant at first denied having been with Wilson that day, he later admitted to the police that Wilson had been in his car but claimed that while he was driving Wilson to New Britain they

were stopped by three men riding in a black Cadillac and that those men had abducted Wilson at gunpoint.

We turn now to the defendant's briefed assignments of error addressed to the court's denial of his three motions to suppress certain of the evidence to which we have referred in our summary of relevant facts found by the court.

The first claim briefed by the defendant is that the court erred in denying his motion to suppress evidence obtained by the police as a result of the seizure of the defendant's automobile on July 13, 1971, and its immobilization until a search warrant was obtained on July 14. It is his claim that the seizure of the car and its retention by the police until the search warrant was obtained violated the defendant's federal fourth amendment constitutional rights. The court made a sixty-five paragraph finding concerning its ruling. None of the facts found by the court has been attacked. Without attempting to summarize all of the relevant facts, we note a few of particular significance. On July 9, the police learned that the defendant owned a compact-type automobile similar to the one in which witnesses had seen the defendant and Wilson on July 3. Their investigation had disclosed that the tire tracks found near Wilson's body had been made by a compact-type vehicle. The defendant had given the police conflicting and erroneous information as to the whereabouts of his car. On the evening of July 9, a friend of the defendant came to the police station and asked the police to give him the keys to the defendant's car. The police believed that some weapons involved in the homicide might be in the car. On July 12, the defendant told the police that Wilson had been in his car on July 3 and had

been abducted from it at gunpoint. The police then teletyped to thirteen states a "Try and Locate" bulletin concerning the car, asking that it be held to be checked for prints and evidence. On July 13, two Hartford policemen observed the car being operated on a public highway in Hartford by Booker T. Walker, the defendant's cousin who lived at 57 Westland Street. The officers had no search warrant and had observed no traffic violations by Walker before they stopped the vehicle. They looked in the windows of the car and observed no contraband goods or weapons. They called for a wrecker and had the car towed to police headquarters. At headquarters an officer compared the tread on the left front tire with a photograph of the tire print found near Wilson's body and was of the opinion that they matched. The car was then towed to the Windsor police department, a search warrant was obtained, and the interior of the car was for the first time searched for evidence. It was this search which disclosed the incriminating blood stains in several areas of the car. The court concluded that the police had probable cause to believe that the defendant's automobile contained or had upon it evidence relating to the Wilson homicide which evidence the police were entitled to seize, that that evidence might be destroyed or secreted by friends or relatives of the defendant, that there was reasonable and probable cause to seize and hold the automobile until a search warrant could be obtained, that there was reasonable cause to issue the search warrant (a fact which the defendant conceded), and that under the circumstances the seizure and impounding of the car was not unreasonable nor was the warrantless examination of the car's left front tire unreasonable.

We find no error in the court's denial of the motion to suppress this car-related evidence and in its holding that the actions of the police did not constitute a violation of the provisions of the fourth amendment proscribing "unreasonable searches and seizures." It is now well recognized that the mobility of automobiles places them in an exceptional category insofar as seizures and searches are concerned. See 49 Conn. B.J. 45, 75, "Contesting Searches and Seizures After the 1972-1974 Terms of the United States Supreme Court." As the United States Supreme Court observed in *Chambers* v. *Maroney,* 399 U.S. 42, 51, 90 S. Ct. 1975, 26 L. Ed. 2d 419, rehearing denied, 400 U.S. 856, 91 S. Ct. 23, 27 L. Ed. 2d 94: "[I]f an effective search is to be made at any time, either the search must be made immediately without a warrant or the car itself must be seized and held without a warrant for whatever period is necessary to obtain a warrant for the search." The similarity in the facts of the present case and those in *Cardwell* v. *Lewis,* 417 U.S. 583, 94 S. Ct. 2464, 41 L. Ed. 2d 325, is striking. In the *Cardwell* case, the police, after arresting, pursuant to a warrant, the defendant for murder, went to the public parking lot where the defendant's car was parked and with probable cause but without a search and seizure warrant towed the car to a police impoundment lot. The next day, still without a warrant, the police matched the cast of a tire impression made at the crime scene with a tire on the car and took paint scrapings which were not different from foreign paint on the fender of the victim's car. The opinion of the United States Supreme Court written by Mr. Justice Blackmun distinguished the warrantless search and seizure from the more general rule requiring warrants in at least three ways. First,

the primary object of the fourth amendment is the protection of privacy, and the search of the exterior of an automobile is far less intrusive on the rights protected by the fourth amendment than the search of one's person or of a building. A car travels public thoroughfares and has little capacity to escape public scrutiny. Id., 589–90. Second, " 'the circumstances that furnish probable cause to search a particular auto for particular articles are most often unforeseeable; moreover, the opportunity to search is fleeting since a car is readily movable.' *Chambers* v. *Maroney,* 399 U.S. [42, 50–51, 90 S. Ct. 1975, 26 L. Ed. 2d 419]. This is strikingly true where the automobile's owner is alerted to police intentions and, as a consequence, the motivation to remove evidence from official grasp is heightened." Id., 590. Third, the case is distinguishable from *Coolidge* v. *New Hampshire,* 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564, reh. denied, 404 U.S. 874, 92 S. Ct. 26, 30 L. Ed. 2d 120, both in the scope of search and in the circumstances of the seizure. The car was seized from a public parking lot where access was not meaningfully restricted, whereas in *Coolidge* the car was parked on the defendant's driveway and seizure required an entry upon private property. *Cardwell* v. *Lewis,* 417 U.S. 583, 593, 94 S. Ct. 2464, 41 L. Ed. 2d 325. Finally, the court answered the defendant's contention that probable cause existed for some time prior to arrest and that, therefore, there were no exigent circumstances justifying the seizure without a warrant. "Assuming that probable cause previously existed, we know of no case or principle that suggests that the right to search on probable cause and the reasonableness of seizing a car under exigent circumstances are foreclosed if a warrant was not obtained at the first

practicable moment. Exigent circumstances with regard to vehicles are not limited to situations where probable cause is unforeseeable and arises only at the time of arrest. Cf. *Chambers* . . . [v. *Maroney,* supra,] 50–51. The exigency may arise at any time, and the fact that the police might have obtained a warrant earlier does not negate the possibility of a current situation's necessitating prompt police action." Id., 595–96. The record in the present case reveals ample facts supporting the court's conclusion that the defendant's automobile was seized with probable cause and that the seizure and external examination was not unreasonable.

We conclude in the light of the court's unattacked finding and the decision of the United States Supreme Court in the *Cardwell* case that there was no error in the court's ruling. See also *England* v. *State,* 274 Md. 264, 334 A.2d 98.

The second claim of error briefed by the defendant is the ruling of the court denying his motion to suppress evidence of the identification of the defendant by two witnesses who, on separate occasions, identified his photograph. It is the claim of the defendant that since at the time of the photographic identification the defendant was incarcerated and available for a lineup, the failure of the police to place him in a lineup for the purposes of identification denied him due process of law. The finding of the court discloses that on August 3, 1971, the police showed six photographs to a witness who had seen the defendant with blood on his shirt at a Windsor gasoline station on the day of the homicide and the witness identified the defendant from among the photographs. On September 16, 1971, another witness who had seen the blood on the defendant's

shirt on July 3 identified among fourteen photographs two of the defendant as the man who had been at the gasoline station on July 3. The conclusions of the court that the photographic identification procedure was not impermissibly suggestive and that considering the totality of circumstances the procedure did not violate the constitutional rights of the defendant have not been attacked, if indeed they properly could be in the light of the decisions in *Simmons* v. *United States*, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247; *State* v. *Panella*, 168 Conn. 532, 537, 362 A.2d 953; *State* v. *Hafner*, 168 Conn. 230, 236, 362 A.2d 925; *State* v. *Watson*, 165 Conn. 577, 591, 345 A.2d 532. The sixth amendment to the United States constitution "does not grant the right to counsel at photographic displays conducted by the Government for the purpose of allowing a witness to attempt an identification of the offender." *United States* v. *Ash*, 413 U.S. 300, 321, 93 S. Ct. 2568, 37 L. Ed. 2d 619; *State* v. *Watson*, supra, 592. The defendant has not cited nor have we found any authority for his claim that the identification by photographic procedure followed by the police was unconstitutional on the grounds that since the defendant was available for identification in a lineup the police were required to use that procedure rather than use photographs.

We find no error in the court's denial of this motion to suppress evidence.

The remaining claim of the defendant is that the court erred in denying his motion to suppress all evidence which was seized from his apartment by the police acting under the authority of a search warrant issued by a judge of the Circuit Court. It

is his claim that the affidavit submitted in support of the application for the warrant failed to set forth adequate credible facts to justify a finding of probable cause to believe that his apartment contained any of the items listed in the search warrant and that the court erred in reaching a contrary conclusion.

We note at the outset the defendant's claim that the trial court, at the hearing on his motion to suppress, improperly considered information in addition to that contained in the affidavit. In a recent case, we made it clear that "[w]hether there is probable cause must be determined on an ex parte basis by the issuing judge upon facts stated in the affidavit purporting to establish grounds for issuing the warrant. General Statutes § 54-33a; *State* v. *Allen,* 155 Conn. 385, 391, 232 A.2d 315; *State* v. *DeNegris,* 153 Conn. 5, 9, 212 A.2d 894; see *State* v. *Rose,* 168 Conn. 623, 628–29, 362 A.2d 813. Historically, the sufficiency and credibility of an affidavit supporting probable cause is tested by the issuing judge or magistrate from the facts recited therein. *United States* v. *Harris,* 403 U.S. 573, 579, 91 S. Ct. 2075, 29 L. Ed. 2d 723; *Aguilar* v. *Texas,* 378 U.S. 108, 114, 84 S. Ct. 1509, 12 L. Ed. 2d 723. 'The question is the reasonableness of the magistrate's belief at the time he acts upon the information, not the ultimate truth or falsity of the information.' *United States* v. *Wong,* 470 F.2d 129, 132 (9th Cir.)." *State* v. *Williams,* 169 Conn. 322, 327, 363 A.2d 72. Hence, if the court, at the suppression hearing, had based its conclusion on additional information not contained in the affidavit and, therefore, not available to the issuing magistrate, it would have been in error; but the court's finding clearly indicates that its conclusion

that there was a substantial basis for the determination of probable cause was based solely on the information contained in the affidavit and in considering its sufficiency we confine ourselves to the facts which appear on the face of the affidavit or which properly may be inferred therefrom.

"It is elementary that a search warrant may issue only on a showing of probable cause supported by oath or affirmation. A person aggrieved by a search and seizure may move to suppress for use as evidence anything obtained upon a warrant when there is not probable cause for believing the existence of the grounds on which the warrant was issued. General Statutes § 54-33f. An affidavit supporting a search warrant must contain sufficient information for the issuing judge to make an independent commonsense determination of probable cause. *State* v. *Grayton,* 163 Conn. 104, 106, 302 A.2d 246, cert. denied, 409 U.S. 1045, 93 S. Ct. 542, 34 L. Ed. 2d 495." *State* v. *Williams,* supra, 326.

The facts as found by the court for the purpose of determining the merits of the motion to suppress may be summarized as follows: On July 9, 1971, officers of the Windsor police department made application to a judge of the Circuit Court for a warrant to search the defendant's apartment at 68D Hendricksen Avenue, Hartford. The property sought and specifically listed in the warrant included a .38 caliber revolver, a .30-30 caliber rifle, or .308 caliber or any like caliber, and a personal letter by John Wilson, the victim, concerning his own death. The affidavit in support of the application recited that "[o]n July 4, 1971 . . . the body of John Wilson of 129 Magnolia Street, Hartford, Connecticut was found in a remote section of

Windsor shot six times. The body had been stripped of personal effects." It stated that when the affiants were "talking with the Murder Victim's brother, Robert Wilson, [also] of 129 Magnolia Street, . . . he stated that on the last day that he (John Wilson) was seen alive, which was July 3, 1971 at about 9:30 AM, was when he (John Wilson) left 129 Magnolia Street, Hartford, Conn. with Willie." It stated that as a result of investigation, the affiants had information that the "last time John Wilson was seen alive was on Saturday, July 3, 1971 at 9:30 AM getting into a car with a subject by the name of 'Willie'"; that "Willie was a drug pusher" and "a known Narcotic dealer in drugs" and that John Wilson was "a Narcotic Pusher and a heavy dealer in drugs"; that "information along with other information developed during this investigation reveals a struggle for the control of narcotic traffic in the City of Hartford"; that Sandra Crouch had seen the defendant with the victim in the past; that two other recent murder victims were "associated with our present victim" and one body was discovered in the same location as the present victim's body; that Attorney Victor J. Dowling who handled personal affairs of the victim told investigators that John Wilson had been in fear of his life and that if anything happened to him "a letter would be left concerning his murder"; that the victim was in possession of a .38 caliber revolver; and that the weapons involved in the murder were a "38 Caliber Revolver and 30-30 Caliber Rifle, or 308 caliber or any like caliber." Since the victim's body had been stripped of personal effects, it was believed the letter was in the hands of the murderer. The affidavit further recited that "[o]n July 8, 1971 at approximately 8:00 P.M., contact was made with

a confidential reliable informant, who has proven himself through previous arrests and convictions." The affidavit reported the informant's information that Willie Williams "had pistol-whipped a person named Alonzo Gilliard about 2 weeks ago, and said victim was taken to McCook Hospital"; that "Willie Williams was involved in the Murder of John Wilson"; and that Willie Williams "may have weapons in his apartment which were seen" by the informant. The information concerning the pistol-whipping of Gilliard was corroborated in part by Sandra Crouch and in part by the McCook Hospital records. That same day the warrant was executed. The search produced ten rounds of .308 caliber Winchester 180 grain soft-point bullet, a type named in the warrant but not introduced into evidence, and two stolen shotguns, not mentioned in the warrant, and neither of which could have been the murder weapon but were nevertheless introduced into evidence.

In considering the attack on the sufficiency of the affidavit, the most significant element was the information stated to have been supplied by the informant, for that alone provided a direct link between the suspected murder weapons and the presence of those weapons in the defendant's apartment. *Aguilar* v. *Texas,* 378 U.S. 108, 114, 84 S. Ct. 1509, 12 L. Ed. 2d 723, " 'states the standard for determining whether an affidavit containing hearsay is sufficient for such an independent judgment: The magistrate must be informed of (1) some of the underlying circumstances relied on by the informant, and (2) some of the underlying circumstances from which the affiant could conclude that the informant was credible or his information reliable.' *State* v. *Grayton,* . . . [163 Conn. 104, 106, 302 A.2d 246,

cert. denied, 409 U.S. 1045, 93 S. Ct. 542, 34 L. Ed. 2d 495]." *State* v. *Romano,* 165 Conn. 239, 243, 332 A.2d 64.

We conclude that the affidavit in question failed to provide the necessary "underlying circumstances." The informant provided information that the defendant two weeks earlier had pistol-whipped a person not involved in the murder, which information was corroborated in part by two separate sources named in the affidavit. But this information, by itself, bears no relationship whatsoever to a subsequent murder of a third person. The affidavit also states that the confidential informant was considered reliable and had provided information leading to previous arrests and convictions. "The previous reliability of an informant, though not constitutionally required, is a basis for crediting his information. See *United States* v. *Harris,* 403 U.S. 573, 581–82, 91 S. Ct. 2075, 29 L. Ed. 2d 723; *State* v. *Grayton,* supra." *State* v. *Romano,* supra, 244. But no underlying circumstances are recited in the affidavit to support the affiants' repetition of the informant's statement that the defendant was involved in the murder of Wilson. There is no information to reduce the chances of a reckless or prevaricating tale. "Moreover, if the informant came by the information indirectly, he did not explain why his sources were reliable. . . . In the absence of a statement detailing the manner in which the information was gathered, it is especially important that the tip describe the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." *Spinelli* v. *United States,* 393

U.S. 410, 416, 89 S. Ct. 584, 21 L. Ed. 2d 637. Further, the affiants' statement that the informant had actually seen weapons in the defendant's apartment gives no indication that those weapons were of the type sought in the warrant. The fact that the informant knew the defendant to be a dealer in narcotic drugs adds little in the way of supporting fact. Nor does the fact that investigation revealed a struggle over control of illegal narcotics traffic contribute to the belief that particular murder weapons would be found in a particular apartment. Here, even if the informant could be considered trustworthy, there are insufficient circumstances from which an independent magistrate could reasonably conclude that the described evidence was present in the apartment to be searched. *Aguilar* v. *Texas,* supra. We cannot say that the ordinary dictates of common experience could have led the issuing judge in the present case to the conclusion that, where the only information linking a known narcotics dealer's apartment with murder weapons consists of a previously reliable informant's uncorroborated assertion that the defendant was involved in the murder and that the informant saw some weapons in the defendant's apartment, there was a " 'substantial basis' for crediting the information supplied by the informant and thus for finding probable cause to issue the warrant." *State* v. *Romano,* supra, 246. There was, accordingly, error in the denial of the defendant's motion to suppress the apartment-related evidence.

Recognizing the existence of this error, we have closely examined the entire record to determine if such error was harmless beyond a reasonable doubt. *Chapman* v. *California,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, reh. denied, 386 U.S. 987, 87

S. Ct. 1283, 18 L. Ed. 2d 241. The list of exhibits admitted on the trial indicates that the only evidence taken from the apartment and introduced as exhibits during the trial were the two shotguns which were in no way connected with the murder. An examination of the transcript reveals that both murder weapons and both shotguns had been stolen at a time prior to the murder from the home of Manning W. Heard. The state introduced the shotguns into evidence in an attempt to demonstrate some connection between the defendant and the murder weapons. Any such connection was, at best, tenuous. On the other hand, substantial untainted evidence from four other separate sources clearly established a definite connection between the defendant and the murder weapons. Alonzo Gilliard testified that he had been pistol-whipped by the defendant with the same pistol which was later used in the murder and he identified the pistol by its unusual barrel which was not round but octagonal and had a ring on the handle. Another witness, a brother-in-law of the defendant who was incarcerated in jail with him on July 21, 1971, testified that after receiving an anonymous telephone call concerning weapons on July 24, 1971, he removed what turned out to have been the murder weapons from the basement of a house at 57 Westland Street where the defendant's cousin lived. Those were the same premises at which the defendant washed his automobile on the morning of July 3—the day of the homicide. Although the brother-in-law testified he acted solely on the basis of the anonymous telephone call and out of fear his sister would be implicated with stolen weapons, a police officer testified, for the purposes of impeachment, to a prior inconsistent statement by the witness that while in jail together the

defendant had told the witness to go to 57 Westland Street, get the two guns there and get rid of them. Two other witnesses testified that they had seen the defendant place a handgun in a brown paper bag in his car on two occasions.

Quite apart from this evidence linking the defendant with the murder weapons, the evidence of guilt was overwhelming. There was expert testimony that a plaster of paris cast impression of tire and rim tracks at the scene of the crime was made by the left front tire of the defendant's car. Expert testimony established that, despite the fact that the defendant had cleaned his car on the day of the homicide, blood, which was of the same type as the victim's, was found in the defendant's car on padding, cardboard, and upholstery from the driver's seat, on the passenger seat, on a piece from the center console, on a rag in the car, a floor mat in the rear, and on a brown paper bag at the crime scene. Two witnesses identified photographs of the defendant as the man who stopped at a gas station near the crime scene about the time of the murder, had blood on his clothes, and bought a can of gasoline with the explanation that the blood had resulted from a knife fight. One of them at the trial identified the defendant as that man. The defendant washed his car at 57 Westland Street on the day of the murder. That was the house from which the murder weapons were later removed. The trial court found that the victim told his brother and Eunice McKenney at about 9 a.m. on the morning of July 3, 1971, that he was leaving with "Willie." A witness, Jerrie O'Neal, saw the defendant and the victim together in the victim's grocery store at about 9:30 a.m. She then saw the defendant driving away with the victim.

On July 12, 1971, while incarcerated, the defendant gave a written statement to the police that admitted that Wilson was in his car on the morning of July 3, 1971, but claimed that Wilson had been abducted at gunpoint from the car by three men whom he named. In his statement, the defendant claimed to have been involved in a discussion earlier with one of the three at the Hofbrau Restaurant on June 30, 1971. Investigation revealed the restaurant had been closed for six months. Not only did the defendant contradict portions of his statement at the trial, but the three alleged abductors offered alibis. On the basis of the facts found by the three-judge trial court, the evidence of the defendant's guilt was so overwhelming that we conclude that beyond a reasonable doubt the error of the court in not suppressing the evidence of the two shotguns which were unrelated to the homicide was a harmless error and the judgment of the court should be affirmed. *Schneble* v. *Florida,* 405 U.S. 427, 92 S. Ct. 1056, 31 L. Ed. 2d 340; *Harrington* v. *California,* 395 U.S. 250, 89 S. Ct. 1726, 23 L. Ed. 2d 284; *Palmer* v. *Adams,* 162 Conn. 316, 328, 294 A.2d 297; *Day* v. *State,* 291 A.2d 286 (Del.); *State* v. *Duffy,* 112 R.I. 276, 308 A.2d 796.

There is no error.

In this opinion the other judges concurred.